Good afternoon. Please be seated. We're here for oral argument in Fields v. Woodford. I guess it's not Woodford anymore. Anyway, Fields v. Warden. Counsel ready? You may proceed. I think so. I can never tell where counsel is sitting. I'm sorry, I don't remember from last time. You represent Mr. Fields? Mr. Colson from Mr. Fields, yes. Yes, how are you? Good, thank you, Your Honor. So we sent, we remanded the case. It comes back from the district court with a finding of no actual bias on the part of Mr. Hilliard. So I think... Thank you, Your Honor. The last time we were here, we spent a lot of time discussing the Diane Hilliard declaration and what it meant and what Fields had proved by that declaration. Today, we're way beyond that, obviously. Thanks to this court's order, we had an opportunity to take depositions, and we believe that the incredible and uncontroverted facts that came out at those depositions established beyond doubt the implied bias claim, the Maddox-Remmer claim, and further support of the McDonough and actual bias claim. And in total, given all of what happened here, the similarities of the crimes, the discussions at night with the wife, the effect that Hilliard testified it had on him during the trial when it was triggering memories of the attack, we have a juror that wasn't indifferent and wasn't impartial as required by the Constitution. Well, we have a finding of non-bias. Do you dispute that? We have a — as I understand what Judge Tavrizian did here, Your Honor, first of all, on the implied bias claim, he Teague-barred it. So that's not a fact-finding. He Teague-barred the implied bias. I understand there's more to your case than that. I'm just asking now a question. We have a finding that there was no actual bias. You could deal with that in one of two ways. You could say we accept it, but we win anyway on some other ground, or you could say we dispute it, but we win anyway on another ground. So I'm just wondering, though, do you challenge the findings? Absolutely. Not only do we challenge it, but I don't think this Court owes it any deference because — It's a fact-finding. It is a fact-finding to the extent — and I think the only fact that he purported to find, Your Honor, was that these conversations didn't have an impact on Mr. Hilliard. The problem with that fact-finding is he didn't apply the Maddox presumption that two recent cases from the Ninth Circuit confirmed. That's the analysis you have to go through, Caliendo and Rutherford. And you don't do that. This Court can't give deference to what Judge Tavrezian did. We don't know if he found that Petitioner didn't carry his burden of proof. Maybe it was 51 to 49. That's not the standard here. Under Maddox's grammar, once we establish, and there's a very low threshold, some potentially prejudicial contact with the juror, the burden shifts to the State. And they have to prove they bear a heavy burden of proving that there was no prejudice, that there was no reasonable probability that these conversations at night impacted Juror Hilliard. And Judge Tavrezian didn't apply that presumption at all. I'm sorry. Are you saying that Judge Tavrezian did not put the burden on the wrong side to establish bias or nonbias? I, frankly, Your Honor, I'm not quite sure what he did, but I know what he didn't do. And what he didn't do is apply the Maddox grammar presumption that he should have  And the analysis here should have been, has the State satisfied its heavy burden of proving that these conversations did not have an impact on Juror Hilliard? That should have been. But the findings from the evidentiary hearing indicate that they did not have any discussions about the substance of the case. So that being true, all you've got is extrinsic conduct, contact that isn't prejudicial. Whether it should or shouldn't have happened, it doesn't bear on the case. It doesn't have anything to do with a witness or a party or the merits of the case. Judge Tavrezian said that the conversations focused on whether Fields could be the person who attacked Ms. Hilliard. I think you look at the depositions, and by the way, we have a situation like Dyer where the Court noted Judge Tavrezian didn't hear a lot of evidence. He has the same transcripts that this Court has. So that would be another reason I think less deference would be owed. But the conversations focused around whether Fields was the person who was still on the loose, who had raped and beat and attacked this juror. And I really don't see how we can say that's not prejudicial. That didn't distract the juror, as the recent cases talk about. Or that didn't render him someone who could not be indifferent and impartial. And every night, she's bugging him about it. The evidentiary hearing shows something quite different from her declaration in that respect. And you keep reverting to the declaration, which I would, too, if I were you. I'm just saying the point is that it's a broader picture than just what was in the one declaration. I misspoke. I'm sorry, Your Honor. I think the depositions went way, way, way beyond what we had here. The depositions confirm that they were discussing the case. They were discussing on a nightly basis whether Fields could be the person who had recently attacked the juror. We learned at the depositions for the first time that Hilliard supposedly had these misgivings about serving, which, again, he didn't disclose during Vore Dyer. I think it makes the McDonough claim stronger. We learned that, in fact, the evidence triggers memories while he's sitting there listening to the case. And we learned something that I think is appalling, that the reason he didn't allow his wife into that courtroom is because he didn't want off this jury. So, again, I think we have a very similar situation to Dyer. We have an excess of zeal to get on this jury, like Freeland. The problem I've got, I think this is extremely difficult, okay, so I do. But the problem I've got is that you, in your brief, and right now, are using loaded words. And so what would be helpful to me is if you get off the use of the loaded words that are conclusory and just talk English about why the conversations with his wife, if that's what we're on right now, actually show that he may have been or was prejudiced. Okay. I apologize for that. I didn't mean to. No, no, no, I apologize for it. It would just be more helpful to me not to have the loaded word. Okay. I guess I think, Your Honor, we have a situation here where what happened to Dianne Hilliard, nobody's disputing, was a horrible thing. And the juror, of course, knew about it. He came to the hospital. He saw her. He's the one who sat up at night for a month after the attack with the shotgun at the door. He was impacted by this, obviously. Of course. So now we should – and, you know, Your Honor, I think you can take judicial notice. Look, you're the victim of a crime and no one's arrested, and the guy has threatened to come back and kill you. This is a horrifying experience. Yes, but, of course, Hilliard, who is the juror, basically testifies. He said, bug off. You're paranoid. Well, he did say that. He also said, I didn't want her to come to this trial, because what if she did identify him as the perpetrator? Then don't you think, in fairness, I need to excuse myself from the – Of course, but what is – here, what's untoward about that? That is a perfectly proper thing. He's saying, I don't want you in the trial. You know, I'm now a juror in this trial. I can't discuss it with you.  I can't discuss it with you, because it might compromise my position, which is otherwise uncompromised. What's inherently wrong with that? Well, I'll tell you. I think to me it shows that, in fact, there had to be some doubt in this man's mind, given how close the crimes were in proximity, how fields looked like the guy, and the crimes that were involved. I, frankly, and I know it's not up to me to make the credibility determinations, but, look, anybody who goes through a situation like this, you are paranoid. Floyd would have been just as paranoid, and he's the one sitting there and has to focus, supposed to be focusing on the evidence of the Fields case, and he's talking every – every night to his wife about whether this sounds like the guy who did that. And I'll tell you another problem I have with this, Your Honor, that goes away from that. Let's assume that we completely believe Floyd Hilliard. My wife was just paranoid. That's the way she is. Ha, ha, you know how women are. That's sort of – there was a point in the depo he said that to me. He still has a problem as a juror here. He still can't be indifferent. I'm sorry. He still has a problem, because he's got a wife who thinks maybe this is the guy who attacked her. So even if Floyd doesn't buy it, he has to vote to acquit somebody and go home and say, gee, honey, the guy walked. I voted to let him back on the streets. He can't do that. Well, of course, that is a forceful argument for why bias should be presumed. It doesn't necessarily denigrate from the fact-finding that Hilliard was, in fact, impartial. Again, I have a real problem with the fact-finding here, Your Honor, and I think if you read Caliendo and Rutherford, I believe both talk about it, you can't defer to what Judge DeVrisian did here, because he used – he didn't apply the – I think we understand your point. You dispute the finding. But unless you have something further to say on that point, let's move on to the implied bias. Assuming now that we accept the district court's finding of no actual bias, is there still room for implied bias? Absolutely. That's why we have the doctrine of implied bias. Well, no. I mean, you couldn't have the doctrine of implied bias saying, look, sometimes you don't know. No way to make a finding. The juror is gone. There's no way to get them back. We'll find out later on that there was this circumstance. So we can't make an actual determination. We have no way of making actual fact-finding. So we use a doctrine of implied bias to imply a bias that doesn't exist – implies a matter of law, a bias that can't be proven as a matter of fact. If that's what implied bias is, then there's no room for it once you have an actual finding of lack of – of bias. Well, certainly there are – I'm aware of cases where they find both. For example, Gonzales is a case where they find that the juror was tainted because of actual and implied bias. It's an interesting question. I would refer the Court to you. It doesn't help much when they find both because, of course, if you find actual bias, you're going to find implied bias, too. Right. I mean, you could say, well, you know, since there's actual bias, there's no room for implied bias, but – Well, Your Honor, you know, it's far more interesting to have a finding of no actual bias and then let's say – but even though we know there's no actual – I mean, again, disputing the finding, but let's say we accept that finding. We know that the juror had no actual bias, but it wouldn't imply bias anyway, contrary to fact. Well, I – I have some difficulty with the idea of those two things coming together. Well, I think the doctrine of implied bias exists for a couple of reasons, and one of them may well be a situation where you can't ask the juror. But it goes beyond that, as the Court noted in Dyer. Look, this looks horrible. The Court has to write an opinion, as Justice Reimer said to me the last time we were here, a comment I thank you for because it's made me focus, I think, a little bit better as a lawyer when I'm before court. You have to write an opinion. And now what? If we find actual bias, we don't care if it appears terrible that this guy was sitting on the juror – jury, which is one of the things the doctrine of implied bias is supposed to protect. And, you know, the other problem with that, Your Honor, is this. Case after case after case where the juror comes in and says, I wasn't affected by what happened. And the courts say, we don't trust – Dyer was a case like that. Friedland said over and over again, it didn't bother me that my brother was murdered. I thought it was an accident. It had nothing to do with the case I was sitting on. I was fair and impartial. I decided that case on the merits. And we say, no, look, this stinks. We're going to imply bias in those cases. Do you have any cases that imply bias solely because a juror's family member was the victim of a similar crime? Your Honor, I looked at that last night. Unfortunately, I was up in San Francisco. The concurring opinion you wrote. I think there are numerous cases, though, that talk about – What's your – there is a case or there is – Well, your question is where a family member has been victimized. And that's the only fact. Right. And you find – And there's no dishonesty. And there's no dishonesty. I'm not aware off the top of my head of such a case. But I think the cases Tinsley v. Borg and the Supreme Court in the United States v. Wood talk about, you know, you don't get bogged down in categories in this area. And U.S. v. Wood, a 36th Supreme Court case, says we have to – you know, we're dealing with a very important right here. It's a Sixth Amendment right, the Sixth Amendment to a fair jury. Sixth Amendment doesn't specify how we analyze this. But the Court says it's substance over form here. So whether a case exists that we could squarely peg into that hole, I apologize, but I don't know of one off the top of my head. But I don't think that's determinative. I mean, we – you know, if the juror lies, that implicates a McDonough situation. But I think it's pretty well established at this point that is not the only way to get to bias. What if Jura Hilliard here was asked directly, have any of your family members been the victims of a crime? And he says, yes, my wife was in a hit-and-run accident. That's a truthful answer for as far as it goes. But I think the case has recognized we need more than that. But again, I think that's just one way you can show implied bias. And the cases talk about a potential for emotional involvement, whether the juror was distracted by these extraneous contacts. And I think we have all of that here. In fact, I think this is an egregious case. Let me ask you – excuse me, Judge Reiner, go ahead. Go ahead. I was going to change the subject for a minute and get to the hearing in State court over the failure to present mitigation. Pardon me? Pardon me? I didn't hear the question. Oh, I wanted to ask you about the mitigation hearing in State court, or the habeas hearing in State court. This is not being argued? Okay. Well, if it's irrelevant, I'll sustain your objection. Are you talking about juror bias today? Are you talking about mitigation? I thought we were talking about the penalty issue. The penalty. Well, I was concerned about who was called to testify at the reference hearing before the habeas – in connection with the habeas petition. As far as I could tell, the only mitigation witness was the aunt. Alice Christopher. Alice Christopher. Why was that? Your Honor, I couldn't answer that. I didn't represent fields at that time. Let's put it this way. The judge didn't say you can't call other people. You weren't prevented from calling other people. Not to my knowledge. I wasn't appointed at that time. I will say this. I think that, you know, even with what was presented by State habeas counsel, Referee Dell found ineffective assistance of counsel. And I think we, when we got appointed, I think we've taken the envelope much further out and shown that there were a lot of people that could have testified back at Fields' trial as to this, you know, horror of an upbringing that he had, including the sexual abuse in Texas, that wasn't even hinted at. My concern is if you have the opportunity to present it in State court and don't do it and you're not prevented from doing so, if that doesn't bind you just to the one who testifies. I can't answer. I really just am unaware of what went on as to whether there was any orders limiting how long the hearing would be or anything like that. I don't – I can't answer that. Is your understanding, the same as Judge Reimers, that the penalty phase questions are not on the – We're prepared to deal with penalty if necessary today. There was a reference in the order, I think, that talked about a 28-J brief should address penalty phase. Okay. But, again, I don't think we get there. I think this is a very compelling case. And I think if you look at Judge Tavizian's analysis, you know, the whole analysis of what Your Honor said the last time we were here, this is a very strong claim. He denied a COA on this. And the whole analysis here is two paragraphs long. When you get out the factual stuff and you get to actual what he's doing, he throws Teague in as, you know. On Teague, let me ask you something, if I may. You just confirmed a minute ago that you are unaware of any case which has held that without a dishonest answer triggers presumptive bias. If that's so, then why isn't that claim Teague barred? Well, Your Honor, I tried to answer what I think was the specific question of a family member being the victim of a crime. There are cases like Alsop, for example. Well, I understand Alsop, of course, was a case where the juror was related, in quotes, to a party. Here, the – that's not the case. And a relationship to a party has just forever been, you know, a no-no. Well, I'd say Gonzales then, too, is another case where the juror discloses, says, you know, my husband had – my ex-husband had these problems and they find – But Gonzales is a 2000 case, so that doesn't help out on Teague. Well, as I – like I said, I have a hard time. Teague – he can't Teague bar the rheumatics claim, first of all, obviously. That goes back to 1892. No, I agree. And I'm not worried about what he did or didn't do. I'm asking you for me. Okay. Well, Your Honor, again, I look at U.S. Wood, which was a case as to whether employees of the government were automatically disqualified from serving on criminal cases. And the Court said the question here is implied bias. And it did a whole analysis based on implied bias. And Dyer references the case where the mayor was sitting as the judge, the two of these cases. Absolutely no question that the general concept of implied bias has been around, as Judge Kuczynski wrote, forever, okay? But he also had a footnote in Dyer which explicitly called attention to the fact that in Dyer they didn't need to decide whether dishonesty was needed or not. And so my question is, if it's an open question, even so late as Dyer, which was 1994. Well, let me try to answer that. First of all, footnote 12 says we've got dishonesty in this case. So that's all we need. So we don't have to go any further where she meets the McDonough test. But I didn't read the Dyer discussion of implied bias to be confined at all. I mean, the Dyer discussion says implied bias has been around forever. It has been, but it's had a dishonesty component. I don't think it has, Your Honor. Cases, there are Supreme Court cases that talk about if the juror is advised of negative information, you can presume bias. Again, the Wood case back in the 30s had a whole discussion on it. And, you know, under Teague, Your Honor, I think maybe where we're heading now here, under Teague, obviously, we don't have to show exact same facts and exact same law. Otherwise, we run into a Teague situation. We're relying on the doctrine of implied bias, and it's been around. It's not a new law. And certainly the notion that a criminal defendant is entitled to a fair and impartial indifferent juror is also not new law. But both concepts are at a pretty high level of generality. And if you've never had a case which has, in fact, presumed bias in the absence of dishonesty, then arguably that's a fairly different result that's not dictated by these prior implied bias cases where honesty has existed. Well, Your Honor, the suggestion then is, again, I would use my hypothetical. Let's say Hilliard said my wife was involved in a hit-and-run accident, and that's all he said. That's a truthful statement for so far as it goes. You know, it seems to me under the authorities that existed back then, Hilliard is still not a kosher juror. And whatever label we use, I don't think it matters for purposes of Teague. Certainly the right to a fair and indifferent impartial juror has been around for long, long before fields. And the courts have used various tools in analyzing whether a particular juror passed constitutional muster. And, again, as U.S. v. Wood says, you know, substance of reform here, we're dealing with a very, very significant right. So as I understand the Teague line of cases, that's really all we need to do is establish that the proposition has been out there, and we don't have to find a case where we fit factually on all fours. I would ask if I could reserve the rest of my time. Thank you. Roberts. Okay. Thank you. We'll hear from the State. Good afternoon, Your Honor. My name is Christopher Jorstad. I'm a California Deputy State Attorney General. Could you talk up just a smidge for me, please? Yes, Your Honor. Maybe put the microphone a little closer. Maybe a little closer. Thank you. Perhaps that's better. I represent the Warden. I'm a Deputy Attorney General of the State of California named Christopher Jorstad. I think that the essence of our argument can be summed up in a very simple declarative sentence. The district court believed Floyd Hilliard. It's critical, as you review this case, to bear in mind that your remand order was extremely carefully drawn and was tightly limited. You asked two questions. The district court, in response to those two questions, said no and no. The questions were did Hilliard intentionally mislead the trial court when he made the statements that he did on Vardyar about the 1976 incident involving his wife? No. That is established as a fact. The second point was did Hilliard and his wife have discussions during the course of the trial about the subject matter of the trial which affected his willingness and capability to use the words of Justice O'Connor in the Smith case, his willingness and capability to decide the case on the basis of the evidence presented in court alone? Judge Teresian answered that emphatically, no. Such conversations did not happen. We still have to decide the ultimate question, don't we? Yes. Of whether bias should nevertheless be presumed. Yes, indeed. Actual bias is a historical question. It's a question of fact. Correct. But presumed bias, as Judge Kaczynski has reminded us and is clear as a bell, is a mixed question. Right. Okay. Because it's by operation of law. So by necessity. So here we have a situation where what happened to the juror's wife is extraordinarily close to the charges that are being made against Sims. This Court suggested as much, and Judge Teresian agreed. Judge Teresian, in fact, found that that was the case. There's no doubt. I understand both of those things are true. So that being the case, why isn't this one of those truly exceptional situations that the Supreme Court in McDonough and we in Tinsley have recognized might call for just presuming bias inherent in the relationship wholly without regard to whether the defendant is and can be impartial and without regard to whether everybody else around him would agree that he appeared to be truly impartial? I think that the answer is there is no lie here. The Court very carefully ran down the reasons why, although, as Dyer teaches, implied bias has been around for hundreds of years. The Supreme Court reminded us of the linchpin of the State's argument on this point, which is that as late as 2005, as late as this Court's last opinion in 309 Fed Third, as late as McDonough itself, the necessary predicate to invoke the doctrine of implied or presumed bias is a dishonest answer. And the reason for that, Your Honor, I think, is perhaps a little, a little cloudy until you begin to focus on it. It seems to me that in the ordinary course of voir dire, a group of standard questions are asked. Many of them have to do with the prospective juror's own personal experience with law enforcement, criminal matters and the like. Very often the Court or the parties will ask questions about the victim's family or relatives. That, of course, did not happen here. It did not. And as we know, Floyd Hilliard was not asked these questions, but voluntarily disgorged this information based on his understanding that it was apt, based on his understanding that it was something that ought to be taken into account. But I want to read the passage from McDonough, because I think it's a direct answer to your question. To obtain a new trial, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for challenge for cause. I submit that neither aspect of the McDonough rule is present in this case. First of all, we have a finding, and this is, you know, in the mixed question of law and fact that you're engaged in, it still is a mixed question, and you base your consideration and your determination of the mixed question on the factual predicate. So what Judge Teresian found happened is a necessary component of your thought on this point. Judge Teresian found that there was no intention to mislead. Quite the opposite. The oddity of this case, and I think this comes through when the Court – I hope the Court has had the opportunity to review at least Mr. Hilliard's video. It's an extraordinary, it's a compelling piece of tape. And I urge you, if you haven't had the opportunity to do so, I think that you will see as late as just a couple of years ago an exceptionally conscientious, intelligent, intuitive, duty-bound citizen. Mr. Hilliard still is not concealing anything. Mr. Hilliard's entire demeanor on that tape says, I want to tell you what I think is true and what happened, what I can recollect. And the district court listened to the tape in making the findings? Yes, the district court. And this was not – there was no life testimony? That's correct, Your Honor. And I'd like to say on that point, since I take it there's at least a faint implication in your question about the nature of deference. I was just asking a factual question. Very well, very well. I'm sure the Court is aware of Federal rule of civil procedure. I must not be so sure if you're going to cite it to me. You must have some doubt. I take the point. I can't say what you want to say, but I'm never less assured I do. The second time around, I take the point. I'm actually just wondering why Mr. Hilliard was not brought into the district court in the flesh. Well, I think that the – If that is the kind of reason you can tell me. Yes, I can. It's in the record. It's not something that's – I can't explain that, Your Honor. Mr. Hilliard kicked and screamed about being tracked down a quarter century after his service. Where was he living at the time? He was living in Indianapolis, Indiana. There was no subpoena power. There was – and, in fact, Mr. Hilliard refused. Judge Tavresian ordered the parties, ordered Petitioner's counsel to depose the four witnesses. That was the express order. The parties – I believe it was the State that first identified where the Hilliards were living. But, you know, we shared that information. And both parties invited him to return to Los Angeles. In fact, as I recall it, although I wasn't myself representing Hilliard, I was representing the warden. I was aware of some of the negotiations around the point. As I recall it, the State offered to put him up to pay for his plane ticket. We were very eager, in fact, to have him in front of Judge Tavresian. When it became apparent that that was not going to happen, the parties went to the expense and the trouble and the hassle of going to Indianapolis and conducting the videotaped depositions by stipulation. There's no – that was the case. And Judge Tavresian, when he was informed, as I believe he was before the depositions took place – I believe he was aware of this difficulty, and I believe he was informed that the parties had stipulated to go to Indianapolis and take the video depositions. Kennedy. Well, let me get to the meat of the coconut as we've been sort of shimmying our way towards it. You know, on this whole question of whether or not ones that are finding – I think your position is, if I distill it down, is now there's been a finding of no actual bias. You've looked in the judge's head. Correct. That precludes a finding of implied bias, because there's no room for implied bias where you actually know there's bias. Am I misreading your argument? Well, you're only missing the McDonough first prong, which – and, of course, you're missing – you haven't gotten to. You're not missing, but you haven't gotten to Teague. But what you've stated – Well, I realize you've got Teague arguments as well. Yes. But you can't talk about all things the same. Very well, of course. What you've stated – what you've stated is, in fact, a central aspect of our position. So let me give you an analogy and tell me whether, you know, it fits and how it fits. Yes. Take judges, for example, okay? If a judge is, in fact, biased – you know, these are decisions we make for ourselves, you know, in cases. Yes, indeed. So let's not even say that's fact-finding. But if a judge, for whatever reason, in a case thinks, look, I can't be impartial. Yes. Disqualifies himself. Correct. He just says I can't sit, I'm impartial. And – but sometimes things happen, you know. And it turns out – just to give us a trivial example, but not so uncommon example. I understand. You discover you've been sitting in a case and, oh, my God, you know, you have $50 worth of stock. Yes. That maybe by the cost of litigation could be affected to the tune of 50 cents. Yes.  Yes. And no sane person would think the judge, you know, would sway – you know, would be swayed by that interest. Nevertheless, we have a rule that says if you have an interest in the outcome, you can't sit. Now, it turns out we have a remedy now. If you discover it late, you can sell your stock then. Correct. In any event, what you cannot do – what you may not do is continue sitting in the case when you discover this conflict, which is a per se – I would say, you know, to use a term now, an implied conflict, even though, you know, you know for yourself you're not biased. And, you know, moreover, anybody looking at it would say, look, there's so little at stake that, you know, nobody would believe there was actual bias. Right. I mean, the two things do live side by side in a highly analogous context in cases of judges where you can – you have dual inquiries. You have one inquiry that looks for actual bias. If you're actually biased, you can say that that's the end of the matter. But you also have a situation where it would look bad, even though you don't have actual bias. You would say, well, people looking at it from afar would say, gee, it just doesn't look right. There is the appearance of partiality, even though we know for a fact there is no actuality. And, therefore, you get knocked out or you have to step out of the case, even though there's no actual bias. And those two things live perfectly fine next to each other. Why isn't the same thing true of Mr. Hilliard? We could say, look, okay, we've now had a district judge. I look at him and I, you know, this judge is a very experienced judge. I believe he was a state judge before he was a federal judge. He's got vast amounts of experience. And we know those judges who have been state judges first are superior in every way. That's right. And, you know, I – huh? But, anyway, the – I mean, you know, we don't have any doubts about Justice – I mean, at least I don't. He's looked at this thing, and I'm perfectly willing to believe his finding that when he says Mr. Hilliard was not, in fact, biased. But why aren't we then required to say, look, but look at the situation. Here we have a juror who, even though, you know, he's a man of steel and does these things, he was heckled every night by his wife about this experience, which was very traumatic for him, very traumatic for her. If I remember correctly, didn't he used to sit with a gun across his knees at night? For several weeks. Guarding her so she would be able to sleep. This was not during the trial, but after the incident. Correct. And so he was deeply emotionally involved in this experience. His wife was distraught about it. And they had sort of these nightly interactions where he had to sort of push her away and say, no, no, no, don't interfere. I want to be able to maintain my impartiality. And somebody could look at that and say, look, you can't do it. You know, whatever it is, you know, you can't maintain impartiality. I think that, attempting to apply your hypothetical situation to this, that it seems that you're necessarily assuming that the judge's interest would become known as Mr. Hilliard's situation became known. And because, as I take the drift of your point, what you're saying is it looks bad, which is to say to others it looks bad, regardless of what's in the conscience. We have lots of rules like that. Yes. For judges where you are disqualified, automatically disqualified. It turns out, for example, if you have a close enough relative, a judge becomes a partner in the firm that's litigating. Yes. You know, that's the end of the matter. And, you know, there's no more talking about it. You say, oh, well, you know, I can separate my mind. It doesn't matter. It's my flesh and blood. Yes. You know, you don't talk about it. It's the end of the matter. I'm not sure this is directly responsive, but let me try. Yes. There is a line of cases, one of the most interesting and compelling of which was cited in the concurring and dissenting opinion, which holds that even in cases, even in cases where the juror herself, himself, has been the victim of the very same crime that the defendant is on trial for, there is no per se bar to service on the jury. And the reason is because we have a procedure for jurors that we don't have for judges, and that's voir dire. And the voir dire is the opportunity for the court and for the parties to probe and to test and to decide, for example, whether to follow up. Sort of one of the kind of unexplored and undisclosed aspects of this case that I find very illuminating is that this was one of the first cases, first capital cases, tried in Los Angeles County after the reimposition of the death penalty. And among those very distinguished State judges that you've mentioned, there was one named Bonnie Lee Martin who happened to preside over this trial. I'm sorry, who? Bonnie Lee Martin. Okay. It wasn't Ron George. Pardon? It wasn't Ron George, who also presided over it. Ron George at the time was a deputy AG in the criminal division. I see. Yes. Right. Another guarantee of yes. Okay. So we have, in fact, and I was going to say we also have Carl Jones as the defense attorney who the Court may well know has gone on to a very distinguished career. Mr. Jones made the tactical decision when he heard the voir dire of Floyd Hilliard that he wanted that juror, that that juror would be good for him. Because she was black? Well, I think that that's one potential possibility. And, in fact, Mr. Hilliard understood that. There are two riveting aspects to the Hilliard tape. One is when he's pushed and pushed and pushed about, well, why didn't you think it was Fields? And he says, and he makes the graphic and extraordinary statement about the differences in the sexual assault. The other is where he says, now, look, I'm black. I'm an African-American. Don't you? And I know kids, relatives and friends of mine who are about in the same position as Stevie Fields. Now, he told Mr. Olson, now, don't you think it's more likely that I'd be lenient to Fields? And I want to say a word, too, about the additional evidence that we have that should be factored in. I don't think it's 606B evidence, and I think that it's potentially even dispositive. Judge Fabrician was very interested and very stirred by the evidence of impartiality from the naked statement. This is not a case where, you know, Mr. Hilliard was asked time and time and time again, you know, can you be fair and swore up and down, lying like Jessica Freeland and others in all the other cases. This is not that case. What it is instead is Mr. Hilliard giving a clear-cut answer to Judge Martin's inquiry, answering truthfully and honestly, and then going into the jury room and becoming Stevie Fields' advocate. This is not just from Mr. Hilliard's deposition testimony. This is from Dolores Henry, another of the black jurors, who said that in the jury deliberations, Hilliard was the guy who kept saying, let's look at every piece of evidence. Let's play what if. And even more compelling is the testimony of Mr. Hilliard. Well, it is fascinating. It is fascinating. Let me ask you this. Suppose you convince us that Hilliard was not improperly impaneled. Yes. He properly got on the jury. Correct. Then you have him going home every night with the wife pestering him about maybe it's the same guy who attacked me. What do we do about that? What's the answer to that? They're conceptually two quite different problems. One is the unanimous, which is implied in the Court's statement. And, of course, the only question which received a unanimous remand order was the discussions. I think that that, too, implicates the anti-retroactivity bar in this sense. I'm not aware of a rule that requires a juror to disgorge all information which he may suppose or imagine might be prejudicial, regardless of the questions that are put to him. No, I'm talking to you. Let's assume he's properly on the jury. Yes. After he's on the jury, while the trial is going on, his wife is communicating to him about the possibility that the guy on trial is the same guy who attacked her. Yes. Yes. It seems to me, Your Honor, that the sort of underlying inquiry here is whether Diane Hilliard was what kind of information did she have and what was she conveying to her husband. It seems to me that the accurate thing to say, based on the depositions, is that she had no information except the information that he was giving her. And what was that? Judge Teresin found bare bones. I'd like to put it this way, and this is a little harsh, perhaps, but it seems to me a stretch to impose a rule that a juror whose wife was the victim of a violent crime, quite similar in several particulars to those charged against the man whose trials he's sitting on, ought to be removed because his wife's fantasy about the possibility that this is the same man. Well, it's not just a fantasy. It's a fantasy that's communicated to him. I mean, if she can fantasize all she wants, when she starts talking to him about it while he's on the jury, it's a different story. But Mr. Hilliard knew, knew that the only information she had was from him. Knew, in fact, that all that she was telling him was based on this sketchy, inchoate, you know, I think the only elements that he – I think he told her that he was sitting on a jury in which there was an abduction and a shooting and perhaps and likely mentioned a young black man. I believe that's what – How do I act on that, on the guilt? I mean, you know, she thinks it's the same guy. He knows it's not the same guy. And he's not going to go convict the wrong guy for this other crime to, you know, because his wife is confused or because his wife – but when you get to the penalty phase, it really is not quite so distant. And the ability to sort of feel the pain of the victim or to, you know, his wife has just gotten – gone through the same experience. She's seen how devastated she has been by this whole thing. And she is there every night having these paranoid illusions. He knows that they're paranoid. They're not the real thing. But he's feeling – every day he's feeling the effect on his life, on his wife, of this crime that was committed by somebody else. Wouldn't that be more likely to cause him to vote for the death penalty than somebody who can say, well, you know, can take a more distance – you know, none of us are immune, but, you know, it's – it can be more impartial. Doesn't this on the penalty phase, doesn't that have an effect? I don't believe it does, Your Honor. And I'd say so. It's closer. Yes, indeed it is, Your Honor. But, of course, in order to get to that point, you are necessarily putting back-to-back speculations and hypotheses, you know, and stretching them out pretty far. And the implied bias that this Court has resorted to has been on a much more substantial basis. How do we know that the wife's conversations to him night after night didn't affect his ability to impartially evaluate the case? Because he said so. Why isn't that 606? I know he said so, but I don't know why he's able to say, what I heard from my wife didn't affect my deliberations. That strikes me as classic 606. I hope this doesn't sound glib, but I think we know it because Judge Terezin found it. But he found it based on Hilliard saying so. And my point is, I'm not sure Hilliard should have been permitted to say so under 606. Well, it's a good question. Do you agree it's 606? 606 is what happened in the – I'm not disagreeing with the suit, I'm just posing the question. 606 is what happens in the jury room. So somebody who has a camera there and sees, you know, tells us what happened, that's 606. Is it limited to the jury room? What's going on in the juror's mind while in the jury room analysis, is that 606? I don't know. I don't believe that it can be when the question is this very question of implied bias arising during the course of the trial. It seems to me that it would be wholly artificial and self-defeating for your analysis to say that we can hear about Diane Hilliard expressing her fantasy over and over again or her guess or her speculation. We can hear about that, but we can't hear about what Floyd Hilliard made of it. Well, in fact, if the issue had come up during the trial, as it sometimes does, that inquiry would, in fact, be made, wouldn't it? I believe it would have to be made. It would have to. Yes. I mean, that's what the judge would do in camera, is go through and find out what effect, if any, the extrinsic evidence or contact had on the juror and whether the juror nevertheless could be fair and impartial. Correct. That's exactly correct. And that, and that. Excuse me. Can I get you back to the point in time where Judge – I mean, this is a follow-up of a challenge assessment.  I'm just trying to tie it back. Yes. Let's say we are now back at the point in time where Judge – I didn't – for some reason, I thought this was lawyer voir dire, but it was not. It was judge voir dire. Correct. Entirely Judge Martin. Correct. At that time. I think at that time it was. Very rare. Typical Judge Martin. But there was – tell me a little bit about it, because now we have a window open into Mr. Hilliard's mind. Yes. Because he is now answering the question, not as to someone saying, you know, what's happening to you at night, but this is now a window into his mind as to his bias. Well. What happens next in State court at that point in time if the jurors say, aha, I want to follow up on it? How would this have been done? What should the lawyer – what could the lawyer have done at that point? If on voir dire, the juror had said – Excuse me. The juror – just so I have a picture. Yes. This is done individual juror by individual juror, or is it done panel by panel? There was no in camera. It was not individualized. So the judge has a panel of, what, 12 or 18 or something? That's correct. A six-pack or – Yes, that's correct. And the questions were posted. The questions were actually written out. And then jurors that have a yes answer nod or raise their hand. Yes. And are then asked for their individual answer to this. That's correct. Is that – That's what happened. Okay. So then Mr. Hilliard raises his hand or whatever, and he is given a chance to personally address the judge and say, my wife was assaulted. Assaulted, beaten. He said, assaulted, comma, beaten and robbed two years ago for Christmas. And I don't want to let this pass because I think it's another potentially dispositive point. Judge DeBresian found he really believed, Floyd Hilliard, when Hilliard said that what he had in mind by using that word assault was a sexual assault. There's another piece of – That was one of the issues we remanded on, whether when he said assault, that was a way of sort of concealing – That's correct. Using the sort of weasel word to conceal it. So, you know, sometimes people use that because they are not comfortable using the word rape in a – Exactly. Or forcible – Yes. So he makes that statement. Right. And what happens next? What would have happened next if the defense lawyer had – Pardon me. What statement did he make? The one that he made. Mr. Hilliard made the statement. Yes. My wife has been beaten, assaulted, and robbed two years ago. Okay? What happens next at that point in State court? You're asking for what happened in this case or what might happen? What might have happened? What could – should the lawyer have done if he wanted to follow up on it? I just wanted to give the – Well, the lawyer could have said, now you used the word assault. What did you mean by that? I'm sorry. This is a question asked by the judge. Correct. Lawyers then can jump in with follow-up. How does that work? Well, to be honest, Your Honor, I don't recall from the record in this case whether Judge Martin said, I'm not going to let lawyers ask questions, but that would be unusual at that time since, as you suggest, in 1979, it was much more common to have direct lawyer aid. So what Judge Martin was doing was a little extraordinary. I doubt very much, and I can check this in the record, that at the beginning of the case the defense lawyer could have followed up on it and gotten more information. Yes. I am convinced of that. And it is your position that he failed to do so for strategic reasons? For – yes. Yes, exactly. That is our position. And a young black man on the jury, he wanted him there. Yes, exactly. That – that it seems to me is a plausible and reasonable account. Well, we don't have Mr. Jones's testimony. But, in fact, in Judge Reimer's opinion of 309 Fed Third, there were three suggested reasons for the strategic decision. And one of them was that he was African-American. You know, another was that he sure looked like a good juror. And 606B or not, he turned out to be. He said it very well, Your Honor, when he said, if I were charged with a crime, I'd want myself on the jury. Okay. Your time is up. Mr. Olson, you reserve some time for rebuttal. Thank you. Thank you, Your Honor. I'm not aware of a case that has facts of a crime against a juror's spouse that are so similar. And in the same case, the crimes are not disclosed. And, Justice Kaczynski, here's what happened. When Hilliard said, assaulted, beaten, and robbed, Judge Martin said, well, there are robberies in this case. Would that impact your ability to be fair? And he said, I doubt it. I think I'd be okay. He concealed, and this is the Williams case out of the U.S. Supreme Court, it's not enough to disclose a truthful answer. He concealed the rape and the kidnap. He concealed the rape. Well, following up Judge Kaczynski's question, as we said in the opinion, it's pretty tough to understand why any lawyer sitting in the courtroom at that point in time wouldn't have said, you know, let's go to sidebar. And in fact, and it's in the record. And I understand you argue, obviously, that it was ineffective. But that opportunity did exist, correct? Absolutely. Absolutely. The prosecutor questioned Hilliard, and Carl Jones questioned 6 of the 12. And frankly, there's no evidence of this race being the issue. Maybe it was, but there's no evidence of that. This is pure conjecture by the State as to why he sat there mute while this guy was talking about an assault and a beating and a robbery. And, you know, I guess that raises the question, would that have even been a tactical decision to defer to? But there's no evidence of that. So Judge Martin, who's doing the question, says there are robberies in this case. That's the problem. And, Justice Silverman, I reread the concurring opinion last night, and you made a comment that we should defer on the vordire to the trial court. The trial court was in the best position to evaluate this jury. That's why we have the McDonough problem here. But she wasn't in that position because he didn't tell her about the rape. He didn't tell her about the kidnap. He didn't tell her what he told me 25 years later. I don't want on this jury. This is too close to home. I have misgivings. I want off this jury. And he had four chances to do this. That's why we can't defer to what Judge Martin did. She did the best she could based on what this juror did. And that's why what this juror disclosed was improper. And this claim got stronger at depositions because he said, as soon as they read the charges, I thought I'd be off this jury. This is a smart man. He understood what the problems were here. And if the court hasn't seen the videotape, I'd urge the court to look at the videotape. Suppose he had said my wife was raped, sodomized, beaten, the whole litany. What do we go from there? Well, that's all sob I think. I mean, you know, that's a case where a juror discloses all the facts. The trial court makes some ruling based on that. Would the judge have been required to excuse that juror for cause without an objection? That's a for-cause dismissal, Your Honor. Two years ago, I mean, if all the facts here had come out, I think that's a for-cause dismissal, where the facts are so close in the crimes and the perpetrator is a young African-American. And the guy says, notwithstanding all of that, I can put that out of my mind. And the judge says, I looked you in the eye and I believe it. It's a different case, but I don't think it's dispositive. I mean, again, you know, Freeland said that in the Dyer case. And in Alsop, there was disclosure. In Gonzales, there was disclosure. I mean, that's why we have the document. There were lies there. That's the big difference. I'm sorry? There were lies there. There weren't lies in the Gonzales case or in Alsop, for example. There were in Dyer. In Dyer, for sure, there were lies. But, you know, the question was, what if the trial judge was there? Well, the question was with full disclosure. I mean, the question was, with full disclosure, would and with a statement believed by the judge, that the juror could be fair and impartial nevertheless and base his decisions solely on the evidence in the court. And under the laws, the judge will instruct it. Would that be reversible error? I think so, Your Honor. I mean, it's a different case, for sure. But, you know, I just don't see how, under our Sixth Amendment jurisprudence, we can condone this. I'm sorry. What would be reversible error? I'm sorry, Your Honor? What Judge Ramos asked, would that be reversible error, and he said yes. But I wasn't quite sure I caught the reference. Absent an objection from the defense, an objection for cause, I mean, let's say the defense lawyer hears all of this and decides, it's a pretty good jury, you know. I look at all the faces in Van Nuyen, and I see much worse, and I'm not going to object. You're not taking the position that it would be a plain error or the judge was required to respond to dismiss a jury even absent an objection. No. That's not our claim. My point is. But here there was no objection. Because. The follow-up. Because, well, the follow-up, we have a claim against Mr. Jones. There was enough disclosed here, I believe, to where he clearly, you know, look, this is a death penalty case, and we've got six jurors up there who he doesn't even question. The point with Judge Martin is, you know, she was a good, experienced judge, and she didn't understand, you know, this notion that Hilliard was trying to sort of be coy about this sexual attack. She didn't get it. And, you know, that's why under Williams and this whole line of cases, the juror's got to be forthcoming, the juror's got to be honest. That's how we pick juries in this country. And you know what? It may have been something embarrassing, but, you know, we protect the defendant's rights. But we are past that point. I mean, we had that question last time, and then we had the remand. It seems to me if Judge Tegresian found anything, he found that this was not a lie, that when he used the word assault, which is a somewhat old-fashioned, but perfectly good synonym for rape, that this was not an attempt to dissuade. This was probably an attempt to be decorous. I mean, I well remember a time when the use of the word rape in polite company was considered to be unacceptable, and he used words like assault as a, you know, you wouldn't talk about a rapist, you'd talk about a masher. I mean, that would be sort of the way people communicated. This was 1979. So certainly within 20 years before that, that would have been sort of standard talk, to talk about rape as an assault and, you know. So I don't think we can get back to the point where you think that Mr. Hilliard was not forthright. But all Judge Tegresian said is that he didn't intentionally mislead the Court. He ignored the question of concealment. And the question of concealment, which is the Williams scenario which was posited on the remand, intentionally misleading or conceal, and Judge Tegresian leaves that alone. He concealed. Whether he intended to conceal or not, I don't think is relevant under the law. When the jury in Williams said, are you related to anybody in the courtroom, she said no. And that was a truthful statement. That was her ex-husband, who was one of the attorneys. She wasn't married to him at the time, and they weren't related. She answered the case, the question honestly. But she didn't give enough facts and detail to make it a full disclosure, and the U.S. Supreme Court had a problem with that. And the last thing I'd like to cover briefly is this question of these horrible discussions that are going on, and supposedly we have a finding below that says, but the juror said it didn't bother him, and do we have to accept that? And several of the cases say Jeffrey V. Wood is one of them. No. And here's one of the reasons why. There could be a very significant impact to Juror Hilliard by hearing all of this that he's not even aware of, and he may be doing his best in good faith, but this stuff, which is in the back of his mind, that his wife thinks this is the guy, can have a tremendous impact on him. Thank you, Mr. Wilson. Okay, thank you. We understand your argument. The case is argued. We stand submitted. Thank you. All right, gentlemen. All rise.
judges: Kozinski, Rymer, Silverman